UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ADAM KRUZELL, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Clean Harbors Savings and
Retirement Plan,

     Plaintiff,

     v.

CLEAN HARBORS ENVIRONMENTAL
SERVICES, INC.,

     and

THE BOARD OF DIRECTORS OF
CLEAN HARBORS ENVIRONMENTAL
SERVICES, INC., ALAN S. MCKIM,
MICHAEL L. BATTLES, AND ERIC W.
GERSTENBERG

     and

RETIREMENT PLAN COMMITTEE

     Defendants

Case No. 1:22-cv-10524-GAO

CLASS ACTION AMENDED
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)

## INTRODUCTION

1.    Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, Clean Harbor Environmental Services, Inc. ("Clean Harbor"), the Board of Directors of the Clean Harbor Environmental Services, Inc., including Alan S. McKim, Michael L. Battles, and Eric W. Gerstenberg ("Board Defendants") (collectively, "Defendants"), and the Retirement Plan Committee and its individual members ("Committee Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Clean Harbor Savings and Retirement Plan (the "Plan" or "Clean Harbor Plan") – that it sponsors and provides to its employees.

6.    During the putative Class Period (April 9, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "offer needlessly expensive investment options," in the form of unreasonable share classes and expensive guaranteed investment contracts or funds ("GICs" or "GIFs"). *See Hughes*, 142 S. Ct. at 740.

7.    These objectively unreasonable investment fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8.    Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered identical investment opportunities at a lower cost. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for these Plan investments.

9.    ERISA's duty of prudence applies to selecting and retaining investments, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10.    There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

11.    The unreasonable selection and retention of Plan investments inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

12. These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

13. To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

15. This Court has personal jurisdiction over Defendants because they transact business in this Judicial District, reside in this Judicial District, and have significant contacts with this Judicial District, and because ERISA provides for nationwide service of process.

16. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in the eastern division of this Judicial District and Defendants reside and may be found in this Judicial District.

17. In conformity with 29 U.S.C. § 1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

18. Plaintiff, Adam Kruzell, is a resident of the State of Michigan and currently resides in Bay City, Bay County, Michigan, and during the Class Period, was a participant and former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

19.    Plaintiff was employed from May 24, 1996 to July 6, 2018, as a General Manager at the Safety-Kleen Systems Facility in Saginaw, MI. Safety-Kleen, Inc. is a wholly-owned subsidiary of Clean Harbors.

20.    Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive investment fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining excessive share classes and General Investment Contracts ("GICs"), and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

21.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injury.

22.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other data, the excessive investment fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

23.    Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022), Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

24.    Clean Harbor Environmental Services, Inc. ("Clean Harbor") is a provider of environmental and industrial services, including hazardous waste disposal for companies, including Fortune 500 companies. Clean Harbor's headquarter is located at 42 Longwater Drive, Norwell, Plymouth County, Massachusetts. In this Complaint, "Clean Harbor" refers

to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

25.    Clean Harbor acted through its officer and Board of Directors, including Alan S. McKim, Michael L. Battles, and Eric W. Gerstenberg ("Board Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Clean Harbor appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Clean Harbor and Board Defendants are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

26.    The Retirement Plan Committee ("Committee Defendants") acted as the Plan Administrator of the Clean Harbor Plan.  As the Administrators, Committee Defendants are fiduciaries with control over the day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A).  Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities, in accord with 29 U.S.C. § 1102(a).

27.    The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Clean Harbor's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

28.    In 2020, the Plan had about $813,744,166 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor its recordkeepers during the Class Period, the Prudential Company of America ("Prudential") or Great-West Annuity & Life

Insurance, Inc. d/b/a Empower Retirement ("Great-West"), to ensure that the Plan investments selected remained the prudent and objectively reasonable choice.

29.    With 12,935 participants in 2020, the Plan had more participants than 99.89% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $813,744,166 in assets in 2020, the Plan had more assets than 99.78% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year.

<u>ERISA'S FIDUCIARY STANDARDS IN THE</u>
<u>DEFINED CONTRIBUTION INDUSTRY</u>

30.    Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

31.    Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

32.    Although Clean Harbor contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive investment fees.

33.    While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

34.     Employers must consider the fees and expenses paid by a plan. Under ERISA, employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

35.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

Investments

36.     Plan fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan participants.

37.     The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

38.     When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, recordkeeping services.

39.     As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the greatest benefit to plan participants, which is the lowest net fee share class.

## THE PLAN

40.     During the entire Class Period, the Plan received recordkeeping services from either Prudential from 2016-2017, or from Great-West, from 2018 to the present.

41.     At all relevant times, the Plan's investment fees, specifically its share classes and its stable value fund offerings were objectively unreasonable and excessive when compared with other materially identical investment options offered by other sponsors that had similar numbers of plan participants.

42.     These excessive Plan investment fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

43.     During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for these investments.

44.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

45.     For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

46. That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager, the risk adjusted returns, and the fees.

47. Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

48. "Institutional Investors," often have access to investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

49. For example, minimum investment requirements and other fees or restrictions are routinely waived for mega retirement plans and were waived with the Plan's investments.

50. As a result, when a plan fiduciary can choose among different share classes to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants. This is critical when the pricing structure provides compensation to the recordkeeping from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

<div align="center">

**THE PLAN PAID UNREASONABLY HIGH FEES
FOR IMPRUDENT SHARE CLASSES**

</div>

51. Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at

small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

52.    There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

53.    For institutional investors, mutual fund companies routinely waive investment minimums for mega retirement plans, and they did so with the Plan. Moreover, mega defined contribution plans, such as the Clean Harbor Plan, have sufficient assets to qualify for the lowest cost share classes.

54.    Unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes. A prudent plan fiduciary selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors.

55.    Choosing the share class that provides the greatest benefit to plan participants is always the prudent choice because the use of the correct share class results in one of the following superior options: 1) the amount of the fees paid to cover the recordkeeping fee will be lower; or 2) the amount of excess revenue credited back to participant accounts is greater.

56.    During the Class Period, Defendants knew or should have known that they were required to select the share classes that provide the greatest benefit to plan participants.

57.    During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

58.    During the Class Period, Defendants did not use share classes that provide the greatest benefit to plan participants and in some cases even switched from one share class to a different share class that charged a higher price.

59.    During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

60.    The following charts identify Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to plan participants:

| Defendants' Investment | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| AVFIX | American Beacon Small Cap Value I | 0.83% | 0.00% | 0.83% | ABSAX | American Beacon Small Cp Val A | 1.27% | 0.50% | 0.77% | 8% |
| RLBGX | American Funds American Balanced R6 | 0.25% | 0.00% | 0.25% | RLBBX | American Funds American Balanced R2 | 1.33% | 1.10% | 0.23% | 9% |
| HRAUX | Carillon Eagle Mid Cap Growth R6 | 0.63% | 0.00% | 0.63% | HAGAX | Carillon Eagle Mid Cap Growth A | 1.03% | 0.50% | 0.53% | 19% |
| HAGIX | Eagle Mid Cap Growth I | 0.72% | 0.15% | 0.57% | HAGAX | Carillon Eagle Mid Cap Growth A | 1.03% | 0.50% | 0.53% | 8% |
| IARFX | Invesco Real Estate Fund R6 | 0.79% | 0.00% | 0.79% | REINX | Invesco Real Estate Investor | 1.23% | 0.50% | 0.73% | 8% |
| MINJX | MFS International Value R6 | 0.62% | 0.00% | 0.62% | MINGX | MFS International Intrinsic Value R3 | 0.97% | 0.50% | 0.47% | 32% |
| MEIKX | MFS Value R6 | 0.45% | 0.00% | 0.45% | MEIHX | MFS Value R3 | 0.80% | 0.50% | 0.30% | 50% |
| PTRQX | PGIM Total Return Bond R6 | 0.39% | 0.00% | 0.39% | PDBZX | PGIM Total Return Bond Z | 0.49% | 0.25% | 0.24% | 63% |
| | Average | 0.59% | 0.02% | 0.57% | | Average | 1.02% | 0.54% | 0.48% | 24.44% |

61.    The underlying data and information reflected in the charts above are accurate and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by Prudential and Great-West.

62.    Based upon data and information reflected in the charts above, the excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the

prudent alternative share class that provided the greatest benefit to Plan participants was approximately 24.44%.

63.    There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 24% higher than an alternative investment option that provides the identical services of the same portfolio manager.

64.    During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, the Plan would have selected the alternative share classes in the chart above.

65.    During the entirety of the Class Period, Defendants knew or should have known about the existence of alternative share classes of the same mutual funds currently selected and performed the analysis to determine the share class that provides the greatest benefit to Plan participants.

66.    During the entirety of the Class Period, Defendants selected a share class that resulted in higher fees to Plan participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's participants.

67.    Defendants could have offered the exact same investments at a lower cost with regard to multiple Plan investments.

68.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these share class allegations do not involve reasonable tradeoffs between differently managed investments. The higher cost

share classes selected by Defendants were identical to those lower-cost shares class identi-fied in the chart above.

69.    As an example, the Plan fiduciaries selected and made available, the MFS Value R6 (MEIKX) to participants in the Plan from 2016 through at least 2020.

70.    As of December 31, 2020, Plan Participants had invested more than $43,301,474 in this investment option. The portfolio managers of this investment option were Nevin P. Chitkara and Katherine A Cannan (Chitkara & Cannan). Plan participants can receive the identical portfolio management services of Chitkara & Cannan through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Chitkara & Cannan, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
|---|---|---|
| | **MFS Value R3** | **MFS Value R6** |
| **Share Class** | R3 | R6 |
| **Investment Advisor** | Massachusetts Financial Services Company | Massachusetts Financial Services Company |
| **Portfolio Managers** | Nevin P. Chitkara and Katherine A Cannan | Nevin P. Chitkara and Katherine A Cannan |
| **Ticker** | MEIHX | MEIKX |
| **Portfolio Management Fee** | 0.44% | 0.44% |
| **Total Expense Ratio** | 0.80% | 0.45% |
| **Revenue Sharing Credit** | 0.50% | 0.00% |
| **Net Investment Expense to Retirement Plans** | 0.30% | 0.45% |

71.     The underlying data and information reflected in the chart above is accurate and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by Prudential and Great-West.

72.     In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of recordkeeping and administration ("RKA") fees.

73.     As a result, the fee paid for the portfolio management services of the portfolio managers Chitkara & Cannan to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

74.     The MFS Value R3 (MEIHX) has the lowest net investment expense at 0.30%. Despite the Total Expense Ratio being higher, the MFS Value R3 (MEIHX) provides the greatest benefit to Plan participants because the 0.50% in revenue sharing that is allocable to RKA services is a credit that is returned to the participants directly or used as a credit against the RKA fee. If the 0.50% allocable to RKA services exceeds the actual RKA fee, then the excess can also be returned to the Plan and its participants.

75.     During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of Chitkara & Cannan if invested in the MFS Value R3 (MEIHX).

76.     When two identical service options are readily available (in this case the portfolio management services of Chitkara & Cannan) and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary chooses the least expensive of those options.

77.     A prudent plan fiduciary understands that the higher "sticker" price of the RKA fee portion of the expense ratio is not relevant since the RKA service provider returns excess revenue to the Plan and its participants.

78.     The Department of Labor ("DOL") requires plan fiduciaries to understand all the fees related to all the various services provided to the Plan and its participants. By selecting an investment option that charges more for identical portfolio management services, the Plan fiduciaries breached their duty of prudence.

79.     A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class that provided the greatest benefit to Plan Participants, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

80.     During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into this prudent share class at the earliest opportunity.

81.     During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's participants through 2020 in the amount of approximately $1,549,419 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Investment Expense to Retirement Plans | $2,179,454 | $2,271,993 | $2,628,410 | $2,603,836 | $2,104,372 | $2,420,226 |

| Prudent Alternative Share Class | | | | | | |
|---|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $2,042,292 | $2,124,146 | $2,456,089 | $2,413,084 | $1,900,837 | $2,211,648 |
| Est. Investment Damages | $137,162 | $147,848 | $172,321 | $190,751 | $203,535 | $208,578 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $137,162 | $301,401 | $539,487 | $706,447 | $1,132,371 | $1,549,419 |

82.    During the entirety of the Class Period, and by failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower fees to Plan participants were available for the same investment, by failing to take effective remedial actions as described herein, or both, Defendants breached their fiduciary duties of prudence to Plaintiff and the Plan participants, and caused substantial losses to Plaintiff and Plan participants.

<u>EXCESSIVE STABLE VALUE FUND FEES</u>

83.    The Prudential Guaranteed Income Fund and the Great West Key Guaranteed Portfolio Fund are types of stable value funds. Stable value funds are fairly common in 401(k) plans. In most cases, stable value products make use of special contracts known as "GICs" or "wraps" that have their own risk and return characteristics. Stable value funds generally are not mutual funds and usually are structured as an insurance company general account, an insurance company separate account, or a synthetic account. The differences between the different types of funds are critical from a fiduciary evaluation.

84.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides liquidity and principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term

bond fund.

85.    Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.

86.    There are several different types of stable value accounts in the 401(k) marketplace. Mega retirement plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are slightly riskier, because there is only one "wrap" provider. As a result, they offer higher crediting rates.

87.    General account products, such as the Prudential GIC and Great-West fund, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently offer the highest rates.

88.    Following the high-profile failure of a number of stable value providers during the credit crisis of 2008 – 2009, the trend among fiduciaries is to avoid general account stable value funds, such as the Prudential and Great-West stable value funds selected by Clean Harbors, because of credit risk concerns.

89.    Both the Prudential Guaranteed Income Fund and Great West Key Guaranteed Portfolio Fund are general account product established pursuant to contracts between Clean Harbors and these providers. The investment funds were deposited by Prudential and

Great-West in their general accounts, which enabled them to earn a "spread" representing the difference between the crediting rate and the returns earned by Prudential and Great-West from general account funds.

90.     As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the Prudential Guaranteed Income Fund and the Great West Key Guaranteed Portfolio Fund to remove or replace them where a substantially identical investment option can be obtained from the same or similar provider at a lower cost.  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.")

91.     Defendants did not have a viable methodology for monitoring the costs of its stable value funds during the Class Period, including the Prudential Guarantee Income Fund ("Prudential GIC") in 2016 or 2017, or the Great West Key Guaranteed Portfolio Fund, from 2018 to the present.

92.     With regard to the Prudential GIC, an *identical* product was available with higher crediting rates and lower spread fees. The Prudential GIC consistently charged the Clean Harbor employees on average 190 basis points more and, consequently, returned 190 basis points less than *the very same fund offered by Prudential to another similarly situated retirement plan*, the WEAC Plan ("Benchmark GIC").

| Fund Year | 2016 | 2017 | Average |
|---|---|---|---|
| Clean Harbors - Prudential GIC (%) | 1.80% | 1.70% | **1.75%** |
| Benchmark GIC (%) | 3.80% | 3.50% | **3.65%** |
| Excess Spread Fees (%) | 2.00% | 1.80% | **1.90%** |

93.     The following table estimates the amount of excess spread fees for the Prudential GIC for each year of the Class Period for which information is available:

| Plan Year | Clean Harbors Prudential GIC (%) | WEA Prudential GIC (%) | Difference (%) | Assets ($) | Excess Spread Fees ($) |
|---|---|---|---|---|---|
| 2016 | 1.80% | 3.80% | 2.00% | $78,964,927 | $1,579,299 |
| 2017 | 1.70% | 3.50% | 1.80% | $79,276,357 | $1,426,974 |
| | | | | Total Excess Spread Fees ($): | $3,006,273 |

94.     Similarly, the Great West Key Guaranteed Portfolio Fund, which has been offered by the Plan from 2018 to the present, is more expensive than the average stable value fund on the Morningstar Stable Value Index ("Hueler Index"). The Great West Key Guaranteed Portfolio Fund consistently charged the Clean Harbor employees on average 66 basis points more and, consequently, returned 66 basis points less than the average fund in the Hueler Index of stable value funds.

| Fund Year | 2018 | 2019 | 2020 | 2021 | Average |
|---|---|---|---|---|---|
| Clean Harbors Key Guaranteed Portfolio (%) | 1.60% | 1.60% | 1.50% | 1.40% | 1.53% |
| Morningstar Stable Value Index (%) | 2.23% | 2.51% | 2.24% | 1.74% | 2.18% |
| Excess Spread Fees (%) | 0.63% | 0.91% | 0.74% | 0.34% | 0.66% |

95.     The following table estimates the amount of excess spread fees paid for Great West Key Guaranteed Portfolio Fund for each year of the Class Period for which information is available:

| Plan Year | Clean Harbors Key Guaranteed Portfolio (%) | Morningstar Stable Value Index (%) | Difference (%) | Assets ($) | Excess Spread Fees ($) |
|---|---|---|---|---|---|
| 2018 | 1.60% | 2.23% | 0.63% | $58,380,122 | $367,795 |
| 2019 | 1.60% | 2.51% | 0.91% | $57,856,814 | $526,497 |
| 2020 | 1.50% | 2.24% | 0.74% | $69,772,334 | $516,315 |
| 2021 | 1.40% | 1.74% | 0.34% | $69,772,334 | $237,226 |
| | | | | Total Excess Spread Fees ($): | $1,647,833 |

96.     Defendants had to make an effort, which it failed to make, to determine whether the same funds were available at a lower cost. Fact sheets showing the available crediting rates or market rates for Prudential and Great-West stable value funds, and similar products from other providers, were readily available had Defendants exercised a minimal amount of due diligence.

97.     This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $4.6 million of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's return against investment returns available elsewhere. Because the product's performance over a given period is *declared six months in advance,* the plan fiduciary knows six months in advance what the returns will be.

98.     The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, generally continues to perform poorly in a stable manner.

99.    A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism, and informs itself of the crediting rates and spread fees available in the market – would have known that Prudential's and Great West's stable value products would underperform and that being stable value products they would continue to underperform in a stable manner.

100.    On the basis of the excessive spread fees alone, the Prudential and Great-West stable value funds were imprudent investments which should have been removed from the Plan. Not only were participants charged excessive fees, but they also lost the opportunity to invest their money in asset classes that delivered higher returns.

101.    A plan with up to a $80 million stable value fund, like the Clean Harbor Plan, has considerable bargaining power in the marketplace. There are any number of stable value products available to plans with a $80 million stable value fund that are simply not available to plans with funds of a smaller size.

102.    To take advantage of this bargaining power, Defendants should have submitted requests for proposal ("RFPs") to stable value fund providers approximately every three years. Products from any number of providers were available with better products, lower fees, and higher crediting rates.

103.    Other employers with 401(k) plans with stable value assets of an even smaller size than the Clean Harbors Plan bid out their stable value funds and obtained better products.

104.    For example, the VSP Retirement Plan, offered by employer Vision Service Plan, Inc. of Rancho Cordova, California, operates a smaller 401(k) plan in size then Clean Harbors with about 6300 plan participants. Yet, the VSP Retirement Plan bid out its Prudential general account stable value fund to obtain a superior product with higher crediting rates in the range of three percent (3.0%). To obtain better rates, all that Defendants had to do was ask.

105.    The Plan funds invested in the Prudential stable value account also were not adequately diversified.  The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, either Prudential or Great-West.

106.    ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

107.    The Prudential GIC and Great West Key Guaranteed Portfolio Fund are not diversified. They are contracts, pieces of paper, subject to the single entity credit risk of Prudential or Great-West, the issuer of the contracts.

108.    In addition, the returns of the Prudential GIC and Great West Key Guaranteed Portfolio Fund depend on crediting rates set at the discretion of a single provider. The crediting rate, set by Prudential or Great-West alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest as with a separate account or synthetic stable value fund.

109.    There are circumstances under which it may be prudent not to diversify the assets of a plan invested in a stable value fund, but this is not such a case. Here, Prudential and Great-West both pocketed significant basis points in excess fees and failed to provide the rate of return that would ordinarily compensate for the Plan's failure to fully diversify its investments.

110.    The Prudential GIC and Great West Key Guaranteed Portfolio Fund were imprudent investments and should have been removed from the Plan. Because these investments were not removed from the Plan in a timely manner, Defendants breached their fiduciary duty of prudence, causing Plaintiff and Plan participants millions of dollars of losses to their retirement accounts.

<div align="center">CLASS ACTION ALLEGATIONS</div>

111.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

112.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Clean Harbor Savings and Retirement Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning April 9, 2016 and running through the date of judgment.

113.    The Class includes over 13,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

<div align="center">24</div>

114.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

      a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

      b.    Whether Defendants breached their fiduciary duties to the Plan;

      c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

      d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

115.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

116.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

117.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for

25

Defendants concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

118.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

119.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

120.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

121.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

122.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

123.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breaches of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against Committee Defendants – Investment Fees)

124.    Plaintiff restates the above allegations as if fully set forth herein.

125.    Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

126.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in managing the investments of the Plan, including share classes and stable value funds.

127.    Committee Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

128.    During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

129. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

130. Committee Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long investments had been in the Plan.

131. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

132. Committee Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating share classes and stable value fund options that were not reasonable, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

133. Committee Defendants failed to employ a prudent process by failing to evaluate the cost of the Plan's investments critically or objectively in comparison to

other more reasonable investment options. Committee Defendants selected and retained for years as Plan investment options unreasonable share classes and stable value funds when other materially identical investment options were readily available to the Plan at all relevant times.

134.    Committee Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

135.    These share class and stable value fund allegations do not involve "reasonable tradeoffs" between differently managed investments. The higher cost share classes and stable value funds selected and retained by Committee Defendants were materially identical to lower-cost shares class and stable value funds.

136.    As a result of Committee Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses in the millions of dollars.

137.    Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

<u>SECOND CLAIM FOR RELIEF</u>
<u>Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendants Clean Harbor
and Board – Investment Fees)</u>

138.    Plaintiff restates the above allegations as if fully set forth herein.

139.    Defendant Clean Harbor and Board Defendants had the authority to appoint and remove members or individuals responsible on the Retirement Plan Committee for Plan investment management fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

140.    Defendant Clean Harbor and Board Defendants had a duty to monitor those individuals responsible for Plan investment management fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

141.    Defendant Clean Harbor and Board Defendants had a duty to ensure that the individuals responsible for Plan investments on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

142.    The objectively unreasonable and excessive investment fees paid by the Plan inferentially suggest that Defendant Clean Harbor and Board Defendants breached their duty to monitor by, among other things:

30

a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment fees on the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonable investment expenses;

b. Failing to monitor the process by which investment fees were evaluated and failing to investigate the availability of more reasonably-priced investment fees; and

c. Failing to remove individuals from the Committee responsible for Plan investment fees whose performance was inadequate in that these individuals continued to pay the same investment costs even though further investigation would have shown that maintaining the selected share classes or stable value funds was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

143. As a consequence of the foregoing breaches of the duty to monitor for investment fees, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

144. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant Clean Harbor and Board Defendants are liable to restore to the Clean Harbor Plan all losses caused by their failure to adequately monitor individuals responsible on the Committee for Plan investment fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

31

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable investment costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.     An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 17th day of June, 2022

<div style="margin-left:50%">

s/ *Paul M. Secunda*
Paul M. Secunda (admitted *pro hac*)
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Jonathan M. Feigenbaum
184 High Street, Suite 503
Boston, MA 02110
Telephone: (617) 357-9700
E-Mail: jonathan@erisaattorneys.com

Troy W. Haney (admitted *pro hac*)
**HANEY LAW OFFICE, P.C.**
330 E. Fulton Street
Grand Rapids, MI 49503
Telephone: (616) 235-2300
E-Mail: thaney@troyhaneylaw.com

Attorneys for Plaintiff

</div>